The **PREPAKT CONCRETE COMPANY,**
Plaintiff,

v.

**AUGUSTO MENENDEZ CONSTRUC-
TION CORP. et al., Defendants.**

**Civ. No. 474–65.**

United States District Court
D. Puerto Rico.

Oct. 21, 1968.

Leslie A. Hynes, New York City, and J. Souss, San Juan, P. R., for plaintiff.

R. J. Sherer, Boston, Mass., and Sutton Keany, of McConnell, Valdes, Kelley & Sifre, San Juan, P. R., for Beacon Const. Co.

L. E. Dubon, Jr., San Juan, P. R., for AMECO.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

This is a diversity action brought by the plaintiff The Prepakt Concrete Company (Prepakt) against all of the defendants to recover for labor and materials furnished by Prepakt in the construction of the United States Post Office, San Juan, Puerto Rico. The defendants Beacon Construction Company of Massachusetts, Inc., Norman B. Leventhal and Robert Leventhal (Beacon) and the defendant Augusto Menéndez Construction Corporation (Ameco) each asserted a cross-claim against the other, each of which seeks, in summary, to compel the other (and its surety) to bear the burden of the Prepakt claim.

The cross-claims were separated, pursuant to Rule 42, Federal Rules of Civil Procedure, and heard prior to the trial of the principal case.

In addition to the evidence taken at the hearing of the cross-claims, the Court also considers those facts established by prior proceedings before the Court and which were taken as undisputed in the Court's order of August 18, 1966.[1]

The Court being fully advised upon the premises, makes and adopts the following

## FINDINGS OF FACT

1. On June 25, 1964, Beacon entered into a contract with the United States Post Office Department (the Post Office contract) to construct, on a pre-selected site, a new postal facility, in Hato Rey, Puerto Rico, and lease the completed building to the United States.[2]

2. Beacon, as the successful bidder (or lessor) under the Post Office contract, had the right to construct the building itself or to engage the services of another contractor.

3. Ameco, a Puerto Rican corporation, has been in existence since 1960, when its president Augusto Menéndez arrived in Puerto Rico (Tr. 11-12).

4. Menéndez, a native of Cuba, spent two years in Florida prior to coming to Puerto Rico (Tr. 12).

5. Ameco had submitted a bid to the Post Office Department in competition with that submitted by Beacon (Tr. 13). Its personnel were, therefore, familiar with the construction requirements of the building.

6. In July of 1964, Ameco submitted to Beacon a proposal for the construction of the Post Office (Tr. 14-15, Ex. 5). The proposal contained a "break down" of Ameco's proposed price into its component elements.

7. On August 20, 1964, Ameco entered into a written contract with Beacon (the Ameco contract, Ex. 1-1)[3] to

---

1. Although the Court's order staying the proceedings was subsequently reversed by the Court of Appeals, Beacon Construction Co. of Mass. v. Prepakt Concrete Co., 375 F.2d 977 (1 Cir.) the facts upon which the order was based were established by affidavits and motions of both of the parties who are now adversaries in the proceedings before the Court. The Court takes judicial notice of its own prior proceedings.

2. The Postmaster General's authority to make such lease contracts is contained in 39 U.S.C. § 2103.

3. Exhibit 1 was the request for admissions served by Beacon and admitted by Ameco. The number following the hyphen represents the exhibit number as attached to the request.

furnish all materials, tools and equipment and perform all labor necessary to complete the construction of the post office for a fixed price of $3,845,000.00.

8. The contract included a schedule of allowances (Appendix A), which were agreed "to be the cost allowance amount to the Contractor of such described work and are embraced in the contract price. * * *" (Ex. 1–1, Section II).

9. The contract further provided that subcontracts for the cost allowance items "are to be entered into" by Beacon on the latter's subcontract form, the total contract price to be adjusted by the difference between the amount of any subcontract and the amount allowed for that work in the schedule of allowances (Ex. 1–1, Appendix A).

10. The contract further provided (Ex. 1–1, Appendix A) that the assignment of any subcontract to Ameco would convey to Ameco all of Beacon's rights under the subcontract and that Ameco would assure all of Beacon's obligations under the subcontract.

11. The contract also provided that any disputes arising under the contract were to be processed in accordance with the provisions of Clause 11, the Disputes Clause, of Post Office Department General Conditions,[4] that Ameco should have no claim for additional compensation for extra work against Beacon except to the extent that Beacon should have such a claim against the United States, and that Beacon would allow Ameco the use of its (Beacon's) name in the prosecution of any such claims (Ex. 1–1, Section VI).

12. Contemporaneously with the execution of the Ameco contract, Ameco as principal, and the defendant Great American Insurance Company as surety (Great American), delivered to Beacon a performance bond (Ex. 1–2) and a payment bond (Ex. 1–3), each in the penal sum of $2,500,000.00.

13. The condition of the payment bond was that Ameco "and his subcon-

tractors shall promptly make payment to all persons supplying to them labor and material in the prosecution of the work provided for in said contract, and * * * indemnify and save harmless * * * Beacon * * * against any expenditure or loss, including counsel fees, arising from claims asserted against * * * Beacon * * * by those claiming to have supplied labor and materials to said principal or his subcontractors."

14. Under date of July 6, 1964, Prepakt entered into a subcontract with Beacon to furnish and install all labor, material and equipment to install the concrete piling required by the Post Office contract for a fixed price of $237,-000.00 (Ex. 1–4).

15. By letter dated September 1, 1964, Beacon informed Ameco that the Prepakt subcontract (and two others) had been assigned to it (Ex. 1–6).

16. At the time the Ameco contract was executed on August 20, 1964, no one in the Ameco organization was aware of the existence of the Prepakt contract (Tr. 7–8).

17. Ameco received these subcontracts in early September, 1964, and was immediately aware that the subcontracts had been signed prior to the signing of its own contract with Beacon and immediately raised objections to them. (Tr. 21).

18. Ameco objected that the schedule of operations contained in the Prepakt subcontract did not conform to its own schedule of operations (Tr. 23, Ex. 7). It also insisted that it be named as an additional obligee on the performance and payment bonds issued in connection with all subcontracts Beacon had sent it (Ex. 1–11). Finally Ameco objected to the fact that the Prepakt contract was executed before the Ameco contract (Tr. 24–25).

19. Ameco refused to accept contract revision number 1 until November 19, 1964 by which time all its objections

4. This is a standard "Wunderlich" disputes clause. See United States v. Carlo Bian-chi & Co., Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652.

had been remedied except Ameco's objection in relation to the earlier execution of the Prepakt contract (Tr. 30). Beacon promised to remedy this latter situation but never did. (Tr. 25).

20. At the same time the subcontracts were sent to Ameco by Beacon, there was also sent a form headed "Purchase Order" and designated Contract Revision #1, the effect of which was to reduce the amount of Ameco contract by $123,400, representing the difference between the amount of the allowances for piling, plumbing and electrical work contained in the Ameco contract and the actual amounts of the subcontracts entered into by Beacon and assigned to Ameco (Ex. 1–9, Ex. 6, Tr. 26).

21. On October 7, 1964, Prepakt and its surety executed a rider to the performance and payment bonds given by them to Beacon, whereby Ameco was substituted as obligee in the place of Beacon (Ex. 1–14C).

22. Beacon also granted and Ameco, on November 19, 1964, accepted, a thirty-day extension of the time for performance of the Ameco contract (Ex. 8, Tr. 30).

23. Thereafter, Ameco treated with Prepakt as its subcontractor in the project. Requisitions for payment for all work performed or claimed to have been performed by Prepakt were submitted to Ameco (Ex. 1, par. B22).

24. By November of 1965, Ameco's requisitions to Beacon (Ex. 1–19, Item Nos. 13, 14, 15) showed all of Prepakt's work as 100% complete.

25. By letter dated December 23, 1964, Ameco notified Prepakt that it had opened in Banco Popular de Puerto Rico an account entitled "Ameco-Augusto Menéndez Construction Corporation, escrow account re Prepakt" into which it would deposit all funds payable to Prepakt "until we are absolutely satisfied of the reliability of your work * * *" (Ex. 1–18).

26. On February 7, 1967, Ameco received from Beacon a final payment check in the amount of $168,481.40 (Ex. 1, par. B20).

27. At the same time, Ameco executed and delivered to Beacon a general release under seal whereby it discharged Beacon "of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which against * * * Beacon * * * it now has or has had * * *" (Ex. 1–22).

28. The release listed certain exceptions. The only one which is material to this proceeding was Exhibit 2 to the release. It provided as follows:

> There is further excepted from this release any claim which Ameco Augusto Menéndez Construction Corporation might have by reason of any claim of the Prepakt Concrete Company. Beacon Construction Company's continuing liability, however, in this matter, shall be limited to its liability under the provisions of the contract between the parties dated August 20, 1964.

29. By letter from its attorney to Beacon's attorney on January 29, 1968, Ameco submitted its "detailed claim * * * for its damages, expenses, and losses resulting from the stop-order of December 7, 1964 * * *" (Ex. 1–23). This claim was submitted for processing "under the administrative procedures stipulated in the contract with the United States Post Office Department" and was without prejudice to the parties' respective positions in this action.

30. Prepakt's claim in the present action is two-fold. First, it seeks to recover its entire contract amount of $237,000; second, it seeks to recover $168,381 in additional compensation which it claims is due it as the result of work beyond the scope of its contract obligations.

31. As a result of the bringing of this action, Beacon has incurred expense

**642**

amounting to $8,000.00 for legal fees (Tr. 2).

32. In addition, in connection with the appeals prosecuted from this Court's order of August 18, 1966, Beacon incurred expenses of $261.50 for its attorney's hotel bill (Ex. 4), and $208.93 for his air travel from Boston to San Juan and return (Ex. 3), and $572.10 for the printing of briefs and record appendix (Ex. 2).

## CONCLUSIONS OF LAW

1. The action by Prepakt is a claim asserted against Beacon, its surety, Reliance Insurance Company, Ameco, and its surety Great American, by one claiming to have supplied labor and materials in connection with the construction of the Hato Rey. P. R. Post Office Building.

2. Beacon is entitled to be indemnified and held harmless by Ameco and Great American against the claim by Prepakt insofar as the same concerns work for which Beacon had paid Ameco.

3. Beacon's representation that the Prepakt contract was to be entered into the future constitutes incidental deceit which renders Beacon liable to indemnify and save Ameco harmless from any loss or damage accruing therefrom, including but not limited to, any adverse judgment in connection with Prepakt's claim.

4. The cause of the Ameco contract became extremely onerous to Ameco as a result of the changed circumstances that required the performance of underpinning work which was not contemplated by the parties at the time of the execution of the contract. The application of the doctrine of *rebus sic stantibus* extinguished the contractual obligations of the parties. Beacon's direction to Ameco ordering the performance of the underpinning work constitutes a motivation which entitles Ameco to recover from Beacon and its surety, Reliance Insurance Company

the reasonable value of the work performed.

5. Beacon, being an assignor in bad faith, is liable to Ameco for all the expenses, losses and damages incurred and suffered by the latter as a result of the assignment of the Prepakt contract.

6. Reliance Insurance Company must indemnify and save Ameco and Great American harmless against any claim, loss or damage accruing to them as a result of the underpinning work Beacon directed Ameco to perform.

7. The release executed by Ameco on February 7, 1967 did not discharge Beacon of its obligations to Ameco relative to the piling and underpinning work.

A judgment shall be entered herein dismissing Beacon's cross-claim against Ameco and Great American Insurance Company; declaring that Beacon must indemnify and save Ameco and Great American harmless against any judgment that may be entered against them in favor of Prepakt on the latter's claim herein for any sum in excess of the Prepakt contract price, less an appropriate credit for the piling underrun; declaring that Reliance Insurance Company, surety for Beacon, indemnify and save Ameco and Great American harmless against any judgment that may be entered against them in favor of Prepakt for any sum in excess of the Prepakt contract price, less a credit for the piling underrun; declaring that Ameco recover judgment against Beacon and its surety, Reliance Insurance Company, for its expenses, losses and damages and declaring that Ameco and Great American, in addition thereto, shall have judgment for their costs and disbursements.

It is so ordered, and counsel for Ameco and Great American will submit appropriate judgment in accordance herewith.